[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Thomas,* Slip Opinion No. 2017-Ohio-8011.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2017-OHIO-8011

THE STATE OF OHIO, APPELLEE, *v*. THOMAS, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Thomas,* Slip Opinion No. 2017-Ohio-8011.]**

*Criminal law—Aggravated murder—Convictions and death sentence reversed and cause remanded.*

(No. 2012-2026—Submitted January 10, 2017—Decided October 4, 2017.)

APPEAL from the Court of Common Pleas of Lake County,

No. 11CR 321.

_____

**O'DONNELL, J.**

**{¶ 1}** Joseph L. Thomas appeals from his aggravated-murder and other felony convictions and the death sentence imposed in connection with the 2010 aggravated murder of Annie M. McSween, and he presents 24 propositions of law for our consideration.  Because the tenth proposition of law—involving the admission of irrelevant, prejudicial evidence—is well taken, we reverse the convictions and sentence and remand this matter to the trial court for a new trial.

**Factual and Procedural History**

**{¶ 2}** On November 25, 2010, Thanksgiving Day, McSween was working as a bartender at Mario's Lakeway Lounge in Mentor-on-the-Lake, located on Andrews Road on a block bordered by Lakeshore Boulevard to the north and Park Street to the east in Lake County, Ohio. Patrons Matthew Miller and Thomas played pool there that evening, and Miller saw that Thomas wore a pocketknife clipped to his jeans. Other witnesses observed that Thomas was upset with his girlfriend, Linda Roncalli, because her van had broken down and she did not meet him for a Thanksgiving dinner that he had prepared, and from her text messages, Thomas thought she had broken up with him. As the night progressed, Thomas asked McSween and another woman to dance, but they both declined; later, at closing time, McSween had to ask him several times to leave the bar. After the bar's owner promised him more beer the next day, Thomas left without incident.

**{¶ 3}** The bar's owner left about 2:30 a.m., and only two people remained in the bar: McSween and Chalina Bolden, a woman who was asleep on a futon in the office. On nights when she closed the bar, McSween would return home around 4:00 a.m.

**{¶ 4}** Between 3:50 and 4:00 a.m. that morning, Mark McCool, who lived within 50 yards of the bar on Park Street, was smoking at an open window in his home when he heard a woman's scream coming from near the bar. He went outside, walked north along Park Street, and looked toward the bar's parking lot, but he did not see or hear anything else.

**{¶ 5}** Margaret Huelsman and Brian Williams were watching a movie in a house on Park Street that is adjacent to the bar's parking lot when around 4:20 or 4:30 a.m. they heard thuds along the north wall and the front door began to open. Assuming that someone was trying to break into the house, Huelsman shut and locked the door, and Williams pulled a small knife from his belt buckle, looked out the front door window, and asked Huelsman whether she knew a "guy with long

hair." (Thomas did not have long hair at the time, and McSween's hair was about shoulder length.) A short time later, Williams walked outside, and when he returned, he told Huelsman that he had not seen anyone.

{¶ 6} Patrolman Scott Daubenmire pulled into the bar's parking lot around 4:30 a.m. for a routine business check. He drove to the back, shining his lights along the building and on boats being stored on an adjacent property, but he did not see anything unusual except for a flat tire on a vehicle.

{¶ 7} Between 5:00 and 5:30 a.m., Robert Jenkins, who lived on Marine Parkway about a half mile from the bar, was awakened by a flashing light on his second-story bedroom wall. He initially thought it was lightning, but when he looked out his window, he saw the silhouette of a tall, thin Caucasian man with short hair standing over a fire in a barrel behind the home of Jenkins's next-door neighbor, Susan Gorsha. Joseph Thomas and Tim Miller, who both lived in Gorsha's house at that time, matched that description.

{¶ 8} Shortly after 8:40 a.m., the owner of a business adjacent to the bar discovered McSween's body, naked except for a pair of socks, in a wooded lot about 150 feet northeast of the bar. Investigators found McSween's car in the bar's parking lot with a slashed tire, her left shoe wedged between the driver's-side front tire and the wheel well, and her keychain on the ground near the tire. They found small amounts of blood on the inside frame of the driver's door, the outside of the driver's-side rear door, and the interior window of the driver's-side rear door. They also found McSween's eyeglasses on the ground 15 to 20 feet from the car.

{¶ 9} About 92 feet northeast of McSween's car, near an excavator stored on the property, investigators discovered McSween's right shoe, her underwear, and a bracelet on the ground. There was a small amount of blood on the excavator's bucket, two large bloodstains on the ground, and a trail of blood leading toward the Park Street house adjacent to the bar's parking lot. Investigators observed bloodstains on the windows, siding, and front door of that house and a pool of blood

on the front stoop.  They also saw drag marks leading from the front stoop through the gravel driveway and into the grass toward the area where McSween's body was found.

{¶ 10} Investigators collected three partial footprint impressions from the area near McSween's car but did not retrieve any useful DNA or fingerprints from the crime scene.  DNA tests showed that all blood recovered from the scene—from the house, the ground, the excavator, and McSween's car—belonged to McSween.

{¶ 11} Two other vehicles parked near the bar had slashed tires, but investigators found no identifiable fingerprints on either vehicle.  In addition, the cable and telephone lines to the bar and the thermostat wires running to an air-conditioning unit had been cut on the rear roof of the bar, and the covers of two boats being stored next to the bar parking lot had been cut open.  Although investigators found a latent fingerprint inside one of the boats, the record does not reveal that it was analyzed.  Patrolman Daubenmire saw footprints inside the boats, but he believed they belonged to another officer who had entered the boats at the crime scene.

{¶ 12} On the afternoon following the murder, a Mentor-on-the-Lake resident found McSween's cell phone in her driveway on the north side of Lakeshore Boulevard, east of Andrews Road.  The back of the phone and the battery were missing, and the screen was cracked.

{¶ 13} An autopsy on McSween's body performed by Dr. Daniel Galita revealed that she died between 4:00 and 4:30 a.m. from blood loss caused by a stab wound to her neck that severed her right carotid artery and right jugular vein. McSween's hyoid bone in her neck was fractured, consistent with manual strangulation, and she had at least five nonlethal cut wounds to the front of her neck. She had been punched in the face, breaking her upper jaw bone and caving in her face, her nose and dentures were broken, and the bridge of her nose had been cut with a knife.  She had defensive wounds on her hands and evidence of blunt impacts

to her torso and extremities, including a rib fracture, and she had brain hemorrhaging from her head hitting a hard surface. Contusions and linear abrasions appeared on her hips, face, torso, and extremities, consistent with having been dragged over a rough surface. She had been forcefully penetrated, both vaginally and anally, by a penis or smooth cylindrical object, but no semen or sperm was found. The autopsy further revealed that she had been stabbed five times in the back after her death.

{¶ 14} Dr. Galita opined that the stab wounds on McSween's body were caused by a single-edged knife with a blunt edge of 1/16th of an inch. He explained that it was not possible to determine the exact length of the knife's blade by looking at the depth of the wounds, "[b]ecause in the soft tissue the length of the wound can be shorter or longer than the real length of the blade," but a blunt edge 1/16th of an inch wide would be consistent with a four- to six-inch blade. However, he also testified that although there is "some correlation" between the width of the blunt edge and the length of the blade, a knife could have a longer, narrower blade or a shorter, thicker blade and still have a blunt edge of 1/16th of an inch.

{¶ 15} Thomas's former girlfriend, Linda Roncalli, had often observed him wearing a blue pocketknife clipped to his pants; she described the blade as three to four inches long, and she had last seen it in December 2010 or January 2011, before he lost it. Christine Vanatta, another ex-girlfriend, had also seen Thomas with a blue pocketknife with a blade three or four inches long four years before the murder. Matthew Miller saw the top of a knife when he played pool with Thomas at the bar on Thanksgiving, but he did not describe it as being blue or having any particular length. There is no evidence that Thomas's blue pocketknife had a blunt edge 1/16th of an inch wide, because it was never recovered.

{¶ 16} The autopsy also revealed that McSween had toxic levels of amphetamine and hydrocodone as well as a lower level of a barbiturate in her body, but Dr. Galita concluded that those drugs did not cause her death. Other evidence

confirmed that she tried to obtain drugs to celebrate her 49th birthday—the day she died. Investigators recovered a text message she sent to Alan Thom, her former boyfriend, on the Sunday before her murder: "Its annie this is my new cell # i've been working mega hours and i was hoping u could help me i have money . . . . . plus friday is my birthday . . . . please call . . . . . . ." (Ellipses sic.) Detective David Strauss interviewed Thom and learned that he sold methamphetamine and had sold some to McSween in the past, but there is no evidence that he had supplied drugs to her that week.

{¶ 17} The Lake County Crime Lab and the Ohio Bureau of Criminal Identification and Investigation ("BCI") tested swabs from McSween's body and her personal effects but found no DNA belonging to Thomas. A BCI analyst determined that a small stain on McSween's underwear contained a mixture of McSween's DNA and a partial DNA profile of an unknown male. A second small stain on the underwear contained a mixture of McSween's DNA and a partial profile of a possibly different unknown male. The analyst concluded that the male DNA in both samples did not belong to Thomas.

{¶ 18} Investigators determined that besides McSween, 37 people had been at the bar on the night before and morning of the murder. By mid-December, the investigation focused on locating one unidentified patron who frequented the bar but was not known well by the others in the bar on the night of the murder. After the police issued a press release describing that patron, Jackie Miller provided a tip identifying him as Thomas, who lived in Susan Gorsha's house on Marine Parkway along with Gorsha, Jackie, her husband, Tim Miller, their seven-year-old son, Anthony, and their two-year-old daughter. On the morning of the killing, Thomas had told Jackie that there had been a murder at the bar and that he had been there that night.

{¶ 19} Thomas voluntarily talked to police and acknowledged that he was at the bar on the night of the murder and that he was among the last to leave. He

said that he had walked to the bar around 10:00 or 11:00 p.m. on Thanksgiving night, played pool, drank three beers and half of a shot, and left around 2:00 a.m., walking north on Andrews Road, east on Lakeshore Boulevard, and then south on Marine Parkway—about a 15-minute walk. He told investigators that he arrived at the Gorsha house around 2:15 a.m. and that Gorsha, who was asleep on the couch, woke up and briefly spoke to him. Gorsha, however, had no clear memory of that morning and did not recall seeing Thomas.

{¶ 20} Thomas also told investigators that Anthony Miller was still awake playing on the computer when he returned home and that they stayed up playing computer games until about 5:00 a.m.—Thomas on his laptop computer and Anthony on his father's desktop computer. Forensic computer evidence showed some activity on Tim Miller's desktop between 2:00 and 5:00 a.m. but did not show activity on Thomas's laptop during that time frame. Anthony remembered that he and his parents had gotten home that night around 2:00 a.m., that Thomas had returned 30 minutes to an hour later, and that they watched a movie together before Anthony fell asleep.

{¶ 21} Thomas denied carrying a knife at the bar or fighting with his girlfriend on Thanksgiving night. He also denied asking anyone to dance.

{¶ 22} Thomas voluntarily submitted to a polygraph examination conducted by BCI in January 2011. The examiner asked four relevant questions: whether Thomas knew who murdered McSween, whether he murdered her, whether he stabbed her, and whether he did anything to cause her death. Thomas answered each question in the negative, and the examiner determined that Thomas "told the substantial truth during the test." Two peer reviews and a rescoring of the results reached the same conclusion.

{¶ 23} In April 2011, after the snow and ice had melted, investigators searched for McSween's clothing along the lakeshore near the crime scene. The search was unsuccessful, but it prompted a nearby resident to provide a tip that led

investigators to question Jenkins, who told them about the fire he saw on the morning of the murder. Investigators then obtained Gorsha's consent to remove the burn barrel. Detective Strauss noticed a strong odor of accelerant or lighter fluid when he looked inside the barrel, which contained the burned remnants of a purse and clothing, including a brown sweater, a tank top, jeans, and a bra, along with a melted mass of cosmetic items. A friend of McSween's confirmed that these items belonged to McSween and that she had worn the clothes to work on Thanksgiving Day. The sweater and cosmetic items contained DNA consistent with McSween's DNA. However, nothing belonging to Thomas—none of his clothing, no DNA, no blood evidence, and no fingerprints—was found in the barrel or on McSween's belongings.

{¶ 24} The police seized and examined the boots that Thomas wore on the night of the killing, and testing revealed none of McSween's blood or DNA on them. The Lake County Crime Lab determined that Thomas's right boot was a possible source of a boot print found near McSween's car, but investigators could not state with certainty that it related to the murder, because it was found in a public location and Thomas had smoked in the parking lot with other patrons that night.

{¶ 25} Officers executed search warrants for Thomas's personal belongings at the Gorsha residence and at Roncalli's home. Among other things, they seized five knives, but they did not find the murder weapon, any of McSween's property, or her DNA on any of Thomas's possessions.

{¶ 26} BCI sent McSween's underwear and vaginal swabs to LabCorp, a private biomedical-testing company, for Y-STR (Y-chromosome short-tandem-repeat) DNA testing, a technique that isolates male DNA. LabCorp found two additional partial male DNA profiles. One profile (which included 3 of 17 Y-chromosome markers) was found on McSween's underwear, and another (which included 6 markers) was found on a vaginal swab. According to LabCorp, the male DNA from the underwear would be found in one in ten males and one in seven

Caucasian males. The male DNA from the vaginal swab would be found in 1 in 926 males and 1 in 510 Caucasian males. LabCorp excluded the bar owner, other patrons, and Tim Miller as the source of these partial profiles but it could not exclude Thomas, and the police arrested him in June 2011 shortly after receiving the LabCorp results. However, Dr. Stephen LaBonne of the Lake County Crime Laboratory indicated that he would only attribute DNA to a source when there is less than a 1 in 30 billion probability of a match.

{¶ 27} A grand jury indicted Thomas on 11 felony counts, including four counts of aggravated murder. Count 1 charged Thomas with aggravated murder with prior calculation and design (R.C. 2903.01(A)). Counts 2, 3, and 4 charged Thomas with felony aggravated murder (R.C. 2903.01(B)), predicated on kidnapping, rape, and aggravated robbery, respectively. Each aggravated-murder count included six death-penalty specifications under R.C. 2929.04(A)(7), alleging that Thomas committed the murder in the course of committing kidnapping, rape, and aggravated robbery. The indictment also charged Thomas with three counts of kidnapping (R.C. 2905.01(A)(2), (3), and (4)) (Counts 5, 6, and 7), one count of rape (R.C. 2907.02(A)(2)) (Count 8), two counts of aggravated robbery (R.C. 2911.01(A)(1) and (3)) (Counts 9 and 10), and one count of tampering with evidence (R.C. 2921.12(A)(1)) (Count 11). He pleaded not guilty to all counts and specifications.

{¶ 28} At the state's request, the trial court excluded all evidence of the polygraph test and results. The state dismissed the fourth, fifth, and sixth capital specifications related to Count 1 before the case was submitted to the jury. The jury then returned guilty verdicts on all counts and the remaining death-penalty specifications.

{¶ 29} The felony aggravated-murder charges were merged into the prior-calculation-and-design aggravated-murder charge before the sentencing phase, and for purposes of capital sentencing, the jury considered only Count 1 and the three

remaining aggravating circumstances associated with that count. The jury recommended a sentence of death, and the trial court accepted the recommendation and imposed that sentence.

{¶ 30} On the noncapital convictions, the court merged allied offenses and imposed an aggregate sentence of 33 years in prison for one count each of kidnapping, rape, aggravated robbery, and tampering with evidence.

{¶ 31} Thomas appealed to this court as of right and presented 24 proportions of law. The tenth proposition of law, asserting that the trial court committed plain error in admitting into evidence five knives that Thomas owned which were unrelated to these crimes, is dispositive.

## Law and Analysis

### *Plain Error Review*

{¶ 32} Crim.R. 52(B) affords appellate courts discretion to correct "[p]lain errors or defects affecting substantial rights" notwithstanding an accused's failure to meet his obligation to bring those errors to the attention of the trial court. However, the accused bears the burden to demonstrate plain error on the record, *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 16, and must show "an error, *i.e.,* a deviation from a legal rule" that constitutes "an 'obvious' defect in the trial proceedings," *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002).

{¶ 33} Even if the error is obvious, it must have affected substantial rights, and "[w]e have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial." *Id.* We recently clarified in *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, that the accused is "required to demonstrate a reasonable *probability* that the error resulted in prejudice—the same deferential standard for reviewing ineffective assistance of counsel claims." (Emphasis sic.) *Id.* at ¶ 22, citing *United States v. Dominguez Benitez,* 542 U.S. 74, 81-83, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004).

{¶ 34} If the accused shows that the trial court committed plain error affecting the outcome of the proceeding, an appellate court is not required to correct it; we have "admonish[ed] courts to notice plain error 'with the utmost caution, under exceptional circumstances and *only* to prevent a manifest miscarriage of justice.' " (Emphasis added.) *Barnes* at 27, quoting *State v. Long,* 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

*Other Weapons Evidence*

{¶ 35} Both Evid.R. 404(B) and R.C. 2945.59 "preclude admission of other acts evidence to prove a character trait in order to demonstrate conduct in conformity with that trait," *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 16, or "to show the accused's propensity or inclination to commit crime," *id.* at ¶ 15.

{¶ 36} Federal and Ohio courts have recognized the introduction of other weapons evidence—i.e., irrelevant evidence of weapons unrelated to the charges—as error. *See*, *e.g*., *United States v. Goliday*, 145 Fed.Appx. 502, 506 (6th Cir.2005) ("when a defendant is not charged with a firearms violation and a firearm is not relevant to the crimes charged, a district court abuses its discretion in admitting the firearm"); *United States v. Matsunaga*, 158 Fed.Appx. 783, 785 (9th Cir.2005), quoting *United States v. Tarazon*, 989 F.2d 1045, 1053 (9th Cir.1993) (" 'the admission of a firearm is improper where the firearm does not relate to any charges against the defendant' "); *United States v. Warledo*, 557 F.2d 721, 725 (10th Cir.1977) ("The courts have quite uniformly condemned the introduction in evidence of testimony concerning dangerous weapons, even though found in the possession of a defendant, which have nothing to do with the crime charged"); *State v. Crosby*, 186 Ohio App.3d 453, 2010-Ohio-1584, 928 N.E.2d 795, ¶ 16 (8th Dist.) (evidence of another gun the defendant was known to have carried "does not link defendant to the gun used to shoot the victim, and was therefore improperly admitted"); *State v. Robinson*, 7th Dist. Jefferson No. 05 JE 8, 2007-Ohio-3501,

¶ 55 ("Evidence that a person carries a gun is the type of 'other acts' evidence which is generally inadmissible since it portrays the person as a violent individual who regularly carried guns"); *see also Major v. Commonwealth*, 177 S.W.3d 700, 710 (Ky.2005) ("weapons, which have no relation to the crime, are inadmissible").

{¶ 37} As the Supreme Court of Colorado has observed, "the fact that a person collects knives or other weapons does not tend to make it more probable that the person is experienced with the use of knives and intends to use a knife to cause serious injury to others. * * * Possession and use are not equivalent." *Kaufman v. People*, 202 P.3d 542, 555 (Colo.2009). The court indicated that by presenting other weapons evidence in that case, "the prosecution was engaging in the very conduct that [Colorado Rule of Evidence] 404(b) was designed to prevent: parading evidence before the jury merely to paint a picture of [the accused] as a bad person." *Id*.

{¶ 38} Error in admitting other weapons evidence falls generally into one of two categories: harmless error or prejudicial error requiring reversal.

Harmless Error Cases

{¶ 39} Cases in which courts have deemed error in the admission of other weapons evidence to be harmless generally involved overwhelming independent evidence of guilt. That is the circumstance presented by the facts of two recent cases decided by this court.

{¶ 40} In *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, we recognized that error in admitting other weapons evidence is harmless " 'if there is substantial other evidence to support the guilty verdict.' " *Id*. at ¶ 158, quoting *State v. Webb,* 70 Ohio St.3d 325, 335, 638 N.E.2d 1023 (1994). Thus, in *Neyland*, we held that the erroneous admission of weapons and ammunition unrelated to the charges was harmless error because the state had presented overwhelming independent evidence of guilt—Neyland had made incriminating statements to police and had been arrested in possession of the murder weapon. *Id*.

12

at ¶ 15, 23-24, 159. Similarly, in *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, we concluded that any error in admitting other weapons was harmless given the overwhelming evidence establishing the guilt of the accused, including his admissions of guilt to police and others, forensic evidence, and his arrest after a standoff with police in which he killed a hostage. *Id*. at ¶ 1, 8-11, 24, 111; *see also State v. Bennett*, 11th Dist. Ashtabula No. 2002-A-0020, 2005-Ohio-1567, ¶ 47-48 (admission of knives unrelated to the charges harmless error in light of overwhelming independent evidence of guilt).

Prejudicial Error Cases

**{¶ 41}** But the case involving Thomas is not a case of overwhelming independent evidence of guilt. When the other weapons evidence "leads only to inferences about matters that were not properly provable in this case, i.e., the defendant's dangerous character," admission of that evidence prejudices the accused and is reversible error. *Walker v. United States*, 490 F.2d 683, 684-685 (8th Cir.1974). Thus, in *State v. Rupe*, 101 Wash.2d 664, 683 P.2d 571 (1984), the Supreme Court of Washington reversed Rupe's death sentence based on the admission during the penalty phase of "irrelevant and highly prejudicial" evidence concerning his collection of guns—none of which were involved in the crime—noting that a juror "might believe that defendant was a dangerous individual and therefore deserved to die, just because he owned guns." *Id.* at 708.

**{¶ 42}** Similarly, in *Agatheas v. State*, 77 So.3d 1232 (Fla.2011), the Supreme Court of Florida explained that evidence of a weapon unconnected to the crime charged is "completely irrelevant under our case law and basic evidentiary principles," *id*. at 1237, and its admission is presumptively harmful error because of the danger the jury will consider the accused's bad character or propensity to crime as evidence of guilt, *id*. at 1239-1240. The court also noted the "confusing and misleading effect" of admitting the unrelated weapon, which had been seized from the accused five years after the crime, *id.* at 1240, so that "[b]y introducing a

weapon entirely unconnected to the crime charged, the State further confused the already unclear evidence regarding the murder weapon," which had never been recovered, *id*.

{¶ 43} In *People v. Drake*, 142 Mich.App. 357, 360, 370 N.W.2d 355 (1985), the Michigan Court of Appeals held that the trial court committed prejudicial error in admitting two handguns that had not been used in the homicide in that case, explaining that the other weapons evidence "could only have inflamed the passions of the jury. This evidence added absolutely nothing to the case against the defendant except to suggest to the jury that he was a bad man." *See also Tornero v. United States*, 94 A.3d 1, 15 (D.C.2014) (holding that it was prejudicial error to admit a BB gun into evidence that was unrelated to the offense because of "the risk that the jurors might too easily link the presence and [the accused's] possession of the BB gun to the shattering of [the victim's] windshield, even in the absence of any other evidence as to *how* this crime was committed" [emphasis sic]).

{¶ 44} And in *State v. Heyder*, 10th Dist. Franklin No. 13AP-298, 2014-Ohio-1066, the accused challenged his convictions relating to the robbery of a store owner at knifepoint. The appellate court reversed the convictions and held that the admission of a knife unrelated to the charges was prejudicial error, because it "could suggest that [the accused] is a dangerous person who carries a knife and that he could have used a knife, albeit a different knife, during the robbery." *Id*. at ¶ 19.

{¶ 45} Here, as in *Heyder*, the trial court committed prejudicial error by admitting evidence of five knives that the state knew were not used in connection with McSween's murder and that the prosecutor relied on to describe Thomas as an owner of "full Rambo combat knives" with the intent to have the jury infer that Thomas is a dangerous person of violent character.

{¶ 46} In contrast to overwhelming evidence cases like *Neyland*, *Trimble*, and *Bennett*, the evidence here is circumstantial and the case against Thomas does not contain overwhelming independent evidence of guilt. The state did not

establish a motive for him to kill McSween—its suggestion that Thomas murdered her because he was upset with his girlfriend over her failure to show up for a Thanksgiving dinner and because McSween had declined his request to dance is not supported by "reason and experience," *Tot v. United States*, 319 U.S. 463, 467, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943). The state did not recover the murder weapon or obtain a confession, and Thomas had no significant criminal history. There is no corroborating, probative, scientific, or forensic evidence to connect Thomas with DNA found on the victim; the LabCorp results indicating that Thomas could not be excluded as a contributor of the partial male DNA profiles found on McSween's underwear and on a vaginal swab are neither definitive nor do they identify the contributor, especially given the high probability that other Caucasian men—one in seven and one in 510, respectively—would not be excluded as the source of those profiles, and as the testimony from Dr. LaBonne explains, DNA can be attributed to a source only when there is less than a 1 in 30 billion probability of a match. Also, no blood, DNA, hair, semen, saliva, or fingerprints belonging to Thomas was found at the crime scene, on the victim's belongings, or on or in the burn barrel, and there is no evidence that he had any visible scratches, swelling, or injuries immediately after the murder. Investigators did not find any of the victim's belongings in his possession, nor was her blood or DNA found on his clothes or shoes. Jenkins did not identify Thomas as the person standing beside the burn barrel on the morning of the killing, and even if he had, the backyard was accessible to others and the state did not establish that the remnants of clothing and the purse had been there for five months. And the strong odor of accelerant detected when officers retrieved the items from the barrel has never been explained.

{¶ 47} In addition, as in *Agatheas*, admitting evidence of weapons unconnected to the charged crimes confused the evidence regarding whether the blue pocketknife was in fact the murder weapon, especially given the expert testimony from Dr. Galita about the length of the blade on the murder weapon

compared with the testimony describing the length of the blade on the blue pocketknife.

{¶ 48} The state further inflamed the jury by presenting and describing these five knives as "full Rambo combat knives" in a case involving a brutal physical assault resulting in strangulation, a broken upper jaw and dentures, multiple rapes, severe stab wounds, and a severed carotid artery and jugular vein resulting in death, especially when none of these knives had anything to do with McSween's murder. It is apparent that the state offered this evidence to portray Thomas as a person of violent character who had acted in conformity with his propensity to kill—a use of evidence prohibited by Evid.R. 404(B) and R.C. 2945.59. This evidence was not only inadmissible but also highly prejudicial, and there is a reasonable probability the trial court's error in admitting it affected the outcome of the trial. Therefore, reversal is necessary to prevent a manifest miscarriage of justice. This proposition of law is well taken.

## Conclusion

{¶ 49} Similar to the conclusion reached by the Supreme Court of Colorado in *Kaufman*, 202 P.3d at 555, we recognize that possessing a knife collection has nothing to do with being able to handle knives. Thomas did not carry any of the knives presented to the jury on the night that McSween was brutally assaulted, strangled, raped, and murdered. Here, the prosecution engaged in the conduct Evid.R. 404(B) is designed to prevent by offering these weapons as evidence that Thomas acted in conformity with a character trait for violence. Thus, the trial court committed plain error in admitting evidence that Thomas owned other knives unrelated to the murder. This evidence painted Thomas as someone with bad character and allowed the jury to convict him on the basis that he acted in conformity with it, violating Evid.R. 404(B). Accordingly, we reverse Thomas's convictions and sentence of death and remand this matter to the trial court for a new trial in accordance with *Lockhart v. Nelson*, 488 U.S. 33, 42, 109 S.Ct. 285, 102

L.Ed.2d 265 (1988), and as we did in *State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284, ¶ 26.

Judgment reversed
and cause remanded.

O'CONNOR, C.J., and O'NEILL, J., concur.

FRENCH, J., concurs in judgment only.

FISCHER, J., dissents, with an opinion joined by KENNEDY and DEWINE, JJ.

_____

**FISCHER, J., dissenting.**

{¶ 50} I acknowledge that it is a close question whether the trial court erred in admitting the evidence of the five knives seized from the possessions of appellant, Joseph L. Thomas. However, I believe that the knife evidence did not have any appreciable impact on the jury's verdict. Therefore, I would reject Thomas's plain-error argument and I respectfully dissent from the majority's judgment.

## I. FACTUAL BACKGROUND

{¶ 51} Annie McSween's body was found on the morning of November 26, 2010, the Friday after Thanksgiving. Her hyoid bone was fractured, consistent with manual strangulation, but she died from blood loss caused by a stab wound to her neck that severed her right carotid artery and right jugular vein.

{¶ 52} The autopsy revealed other nonlethal injuries that may have been caused by a knife. McSween had at least five cut wounds to the front of her neck. She had several defensive wounds on her hands. She had been stabbed five times in the back, most likely after her death. The medical examiner opined that the perpetrator used a single-edged knife with a four- to six-inch blade.

{¶ 53} Matthew Miller, a bar patron who played pool with Thomas on Thanksgiving night, testified that he saw Thomas wearing a knife clipped to his jeans on Thanksgiving night. Thomas denied carrying a knife at the bar that night.

Thomas's then girlfriend, Linda Roncalli, however, testified that Thomas always had a blue knife clipped to his pants when they were together, that she last saw it around December 2010 or January 2011, and that Thomas later told her that he had lost it. Another ex-girlfriend testified that years earlier, Thomas always carried a blue pocketknife clipped to his pants when they went to bars. She said that the blade of that knife was three to four inches long.

## II. LEGAL ANALYSIS

### A. Thomas's Knives

{¶ 54} In his tenth proposition of law, Thomas argues that the trial court erred and violated his due-process rights by admitting evidence of the five seized knives, which were not used in McSween's murder or the vandalism discovered at the scene. Because he did not object to this evidence at trial, we review for plain error. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 80.

{¶ 55} Investigators never located the knife used in the murder or the vandalism, nor did they find the blue clip-on knife Thomas was seen carrying the night of the murder. They did, however, seize three folding knives and two sheathed knives from Thomas's belongings at his then residence and at Roncalli's home. The state concedes that none of these knives was used in the murder or the vandalism. Yet it introduced all five knives at trial, along with photographs of each. The trial court admitted the knives and photographs, and it allowed testimony concerning them, without an objection by defense counsel.

{¶ 56} The state referred to the five seized knives during its closing argument and at one point held one up to the jury. The prosecutor said:

> You recall when Special Agent Kollar took the stand and he showed you the knives that the police seized from the Marine Parkway place where Joe was living. He showed you this knife.

And I asked him, I said, how long is the blade of this knife? Now, I'm not suggesting in any way this is the murder weapon, but I'm holding this up to show you, he said this is a four inch blade. So, it was a knife similar, with a blade similar that caused the death of Ann McSween. Something about this big. Didn't take much.

**{¶ 57}** And later, the prosecutor argued:

Who owns and [sic] knives? Joe Thomas. And I know that there are people out there who collect knives, but he's got six knives. There's that blue knife that we never found that people described * * *. When you asked him in his interviews what about a knife and clip? I don't have one like that. I only have this—I have this little red one I used to carry when I was going out to help my friend at a power line. A little red one. Did you see some of the knives he has? I mean, some of those are full Rambo combat knives. This man is obviously fixed [sic] and likes knives.

## B. Plain-Error Analysis

**{¶ 58}** To prevail on his plain-error claim, Thomas must show that an error occurred, was plain (i.e., obvious), and affected his substantial rights. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). If he makes this three-part showing, the court then must decide whether we will, in our discretion, correct the error. *Id.*

**{¶ 59}** This court first must determine whether the trial court's admission of the evidence of the seized knives was erroneous. Thomas currently contends that the knife evidence was inadmissible because it was irrelevant to the state's charges and unfairly prejudicial to his defense. " 'Relevant evidence' means

evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Under Evid.R. 404(B), evidence of "other acts" may be relevant to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," but such evidence "is not admissible to prove the character of a person in order to show action in conformity therewith." Irrelevant evidence is not admissible. Evid.R. 402.

## 1. *Relevance of the evidence*

**{¶ 60}** It is a close question whether the evidence of the five seized knives was relevant and therefore admissible. This court addressed a similar question in *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 102-103, a capital case in which the trial court admitted numerous firearms that were found in Trimble's basement, even though those weapons had not been used in the murders. Although we ultimately held that Trimble's ownership of the firearms was relevant under Evid.R. 404(B) to rebut his claim that he accidentally shot one of his victims, we did so only after rejecting three other arguments made by the state. *Id*. at ¶ 105-110. We held that weapons not linked to the murders were irrelevant to proving that Trimble acted with prior calculation and design, that he had access to firearms, or that he was familiar with using firearms. *Id*. at ¶ 106-108.

**{¶ 61}** We again addressed this issue in *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 153, another capital case, in which the trial court admitted photographs of weapons and ammunition unrelated to the charged offenses. Applying our analysis in *Trimble*, we concluded that weapons and ammunition unrelated to the crimes "had no relevance in proving Neyland's prior calculation and design as charged in the aggravated-murder offenses." *Neyland* at ¶ 157.

**{¶ 62}** Other Ohio courts also have found that weapons unrelated to the crimes at issue were irrelevant under Evid.R. 401 and 404(B).  In *State v. Bennett*, 11th Dist. Ashtabula No. 2002-A-0020, 2005-Ohio-1567, the trial court admitted evidence of several knives that belonged to a defendant accused of stabbing his victim, even though they had not been used in the crime and the murder weapon had not been found.  *Id*. at ¶ 2, 11, 15, 18, and 37.  The court of appeals held that the trial court erred in admitting the knives because the defendant's collection of and access to knives was irrelevant.  *Id*. at ¶ 45-46.  Likewise, in *State v. Heyder*, 10th Dist. Franklin No. 13AP-298, 2014-Ohio-1066, the court of appeals reversed an aggravated-robbery conviction (premised on the defendant's possession of a knife during the robbery) because the trial court admitted evidence of a knife that was not used in the robbery.

**{¶ 63}** Here, the evidence of the five seized knives arguably may not have made the existence of any consequential fact more or less probable, and the knives arguably may not have served a relevant purpose under Evid.R. 404(B) for the state's case.  As the lead opinion notes, none of the knives introduced into evidence was the actual murder weapon.

**{¶ 64}** However, I disagree with the lead opinion's determination that the trial court's admission of the knife evidence was obviously erroneous.  Evid.R. 401 specifies that evidence is relevant if it has "any tendency to make the existence of any fact" of consequence more or less probable.  A witness testified that Thomas carried a blue pocketknife with a blade that was three- to four-inches long.  The medical examiner who conducted the autopsy opined that the perpetrator used a knife with a four- to six-inch blade.  The blue pocketknife therefore could have been the murder weapon, and the fact that investigators were able to find Thomas's other knives but could not find the blue pocketknife has a tendency to make Thomas's disposal of the blue knife more probable.

**{¶ 65}** Based on these facts, it is not clear that Ohio law would have supported an effort by Thomas to exclude evidence of the five seized knives. I therefore do not join in the lead opinion's determination that the trial court obviously erred in admitting the knife evidence.

### 2. *The alleged error did not affect Thomas's substantial rights*

**{¶ 66}** Even assuming arguendo that the knife evidence was obviously irrelevant, to qualify as correctible plain error, the defect "must have affected 'substantial rights,' " which "mean[s] that the trial court's error must have affected the outcome of the trial." *Barnes*, 94 Ohio St.3d at 27, 759 N.E.2d 1240. On this question, this court has long held that plain error will not be corrected "unless, *but for* the error, the outcome of the trial *clearly* would have been otherwise." (Emphasis added.) *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus. More recently, this court articulated a different standard under which a defendant need only "demonstrate a reasonable *probability* that the error resulted in prejudice." (Emphasis sic.) *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22, citing *United States v. Dominguez-Benitez*, 542 U.S. 74, 81-83, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004). In doing so, however, we did not expressly overrule *Long*. Indeed, we have continued to apply *Long*'s clearly-would-have-been-otherwise standard since *Rogers* was decided. *See State v. Cepec*, 149 Ohio St.3d 438, 2016-Ohio-8076, 75 N.E.3d 1185, ¶ 67, *cert. denied*, __ U.S. __, 137 S.Ct. 2217, 198 L.Ed.2d 662 (2017). I believe that our statement in *Rogers* did not fully reflect Ohio law and that we should follow our holding in *Long*, which has applied for nearly four decades. Thus, rather than ask, as the lead opinion does, whether there is a reasonable probability that the trial court's admission of the knife evidence affected the outcome of the trial, I would determine, pursuant to *Long*, whether, but for the admission of the knife evidence, the outcome of the trial clearly would have been otherwise.

{¶ 67} Thomas has not shown that the outcome of the trial clearly would have been otherwise had the evidence of the seized knives been excluded. Rather than solely portraying Thomas as a bad person, as the lead opinion suggests, the knife evidence theoretically *benefited* Thomas. Defense counsel smartly exploited the evidence for Thomas's benefit during cross-examination of two witnesses by confirming that McSween's DNA was not on any of the knives and that the knives were not used in the vandalism. And during closing argument, defense counsel emphasized that none of the seized knives was the murder weapon by noting that "all of Joe's knives ha[d] been tested and tested clean, no DNA." The state's inability to produce the murder weapon weighed positively in the defense's favor, and if the evidence of the seized knives had not been introduced, the defense would have lost an opportunity to emphasize this fact. Therefore, it is not clear that the trial would have resulted in a finding of not guilty if the court had excluded the knife evidence.

{¶ 68} In support of its conclusion that the trial court's admission of the knife evidence affected Thomas's substantial rights, the lead opinion states that the case against Thomas did not contain overwhelming independent evidence of guilt. For example, the lead opinion faults the state for failing to establish a motive for Thomas to kill McSween; however, although Thomas denied it, evidence showed that he had fought with his girlfriend that night and seemed to believe that she had broken up with him. Evidence introduced by the state also suggested that he unsuccessfully asked other women—including McSween—to dance at the bar that night.

{¶ 69} In fact, substantial and compelling evidence supported the jury's verdict. It is undisputed that Thomas and McSween were both present at the bar within two hours before the murder. Thomas was seen that night in possession of a knife with a blade that was consistent in size with the medical examiner's description of the murder weapon. About an hour after McSween's death, a

neighbor saw a man matching Thomas's general description standing by a fire in a barrel behind Thomas's residence. Investigators later found McSween's half-burned clothes in that same barrel. In light of this evidence, I would conclude that we cannot say that the evidence of the seized knives had any appreciable impact on the jury's verdict. All of this evidence establishes Thomas's guilt independent of the admitted knife evidence.

{¶ 70} It may be that the majority considers the admission of the evidence of Thomas's knives to be reversible error because his convictions are based on circumstantial evidence. But this court has held that murder convictions "can rest solely on circumstantial evidence," even in capital cases. *State v. Lott*, 51 Ohio St.3d 160, 167, 555 N.E.2d 293 (1990). We have also explained that "[c]ircumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus. Even though the evidence supporting Thomas's guilt in this case was circumstantial, it is sufficient to support his convictions. The outcome of the trial would not clearly have resulted in a finding of not guilty if the trial court had excluded the knife evidence.

{¶ 71} Defense counsel used the same evidence that the lead opinion relies upon to reverse the jury's verdict after a trial that took approximately three weeks to instead strategically enhance their client's case, by showing that the seized knives could *not* be linked to McSween and that they were *not* used to carry out the crimes. This court should not—but the lead opinion does today—conclude that the admission of that exact same evidence, tactically used by defense counsel to affirmatively highlight the absence of any direct evidence—and particularly the absence of a murder weapon that belonged to Thomas—is so clearly and highly prejudicial as to constitute plain error.

### III.  CONCLUSION

{¶ 72} Assuming arguendo that the trial court committed error in admitting the evidence of the five seized knives, that error did not constitute plain error because the trial would not clearly have resulted in a finding of not guilty if the court had acted otherwise.  I would reject Thomas's plain-error claim based on the admission of the knife evidence, and I would accordingly address the remaining issues raised by Thomas in his appeal.

KENNEDY and DEWINE, JJ., concur in the foregoing opinion.

_____

Charles E. Coulson, Lake County Prosecuting Attorney, and Alana A. Rezaee, Charles F. Cichocki, Patrick J. Condon, and Karen A. Sheppert, Assistant Prosecuting Attorneys, for appellee.

John P. Parker; and Law Office of Timothy Farrell Sweeney and Timothy F. Sweeney, for appellant.

_____