[Cite as *State v. Flagg*, 2018-Ohio-1702.]

# IN THE COURT OF APPEALS

# FIRST APPELLATE DISTRICT OF OHIO

# HAMILTON COUNTY, OHIO


STATE OF OHIO,                              :          APPEAL NO. C-170015
                                                       TRIAL NO. B-1502174
    Plaintiff-Appellee,              :
                                                       *O P I N I O N.*
  vs.                                       :

NIKOLE FLAGG,                               :

    Defendant-Appellant.             :



Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  May 2, 2018



*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Judith Anton Lapp*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *David Hoffmann*, Assistant Public Defender, for Defendant-Appellant.

**Mock, Presiding Judge.**

{¶1}     Following a second jury trial, defendant-appellant Nikole Flagg, who is a drug addict, was convicted of aggravated murder, aggravated robbery, tampering with evidence and gross abuse of a corpse.   Flagg repeatedly stabbed her mother to death, doused the body and crime scene with bleach, and stole her mother's cellular phone.   She then used the phone as currency to purchase crack cocaine from her drug dealer, Matthew Barwick.   The trial court sentenced Flagg to life without parole for the aggravated murder, 11 years for the aggravated robbery, three years for tampering with evidence and one year for gross abuse of a corpse.   The trial court ordered the sentences to be served consecutively, for an aggregate sentence of life without parole, plus 15 years.

{¶2}     Flagg now appeals her convictions, arguing that she was not the perpetrator of these crimes, that her second trial violated double jeopardy protections in the state and federal constitutions, that the trial court erroneously admitted evidence of other weapons, that she had received ineffective assistance of counsel and that the offenses of aggravated murder and aggravated robbery were allied and should have been merged for purposes of sentencing.   Finding no merit to these arguments, we affirm the trial court's judgment.

### First Trial

{¶3}     Prior to the first jury trial, the trial court presided over a three-day hearing on Flagg's motion in limine, where she sought to prevent the state from referencing or admitting her prior conviction for voluntary manslaughter.   The trial court granted her motion.

{¶4} During opening arguments, co-counsel for the defense told the jury two separate times that although Flagg is a crack addict and a thief, she does not kill. There was no objection to these comments by the state. At the close of opening arguments, the trial court excused the jury and asked the state if they wanted to use Flagg's prior conviction at trial despite the fact that the court had granted Flagg's motion in limine. The trial judge said he believed that defense counsel's comments may have opened the door for the state's use of the prior conviction, and asked the parties to research and argue the issue. Ultimately, the trial court ruled that defense counsel's comments had opened the door, and, based on that ruling, defense counsel moved for a mistrial on the grounds of ineffective assistance of counsel. The trial judge said that he had "anticipated your motion and I expected you to make it." The court then took the motion under submission, and ultimately granted the mistrial the next day.

**Second Trial - Facts**

{¶5} The parties do not dispute that Myrvinia Lowe, Flagg's mother, was murdered shortly before 3:00 p.m. on Friday, April 10, 2015, in her apartment located in the Pleasant Ridge neighborhood of Cincinnati. Lowe failed to show up for her second-shift job at Children's Hospital, which was unusual for her. A month prior to her murder, her son, Maurice Allen, had been living with her, sleeping on an air mattress in the living room and often playing the stereo at night. Allen testified that Lowe was concerned about Flagg's drug problem and was scared of her. Consequently, Lowe would hide her cash in her bible, her bra, and under the trash-can liner. Although Allen had warned his mother against letting Flagg in her

apartment when he was not there, Lowe would occasionally pay Flagg to style her hair.

{¶6} On April 9, 2015, Flagg's alleged boyfriend refused to rent a room to her because she already owed him money and he believed that she would spend what money she had on drugs and not rent. Instead, he drove her to her mother's neighborhood, where she spent a night in the woods because she did not have access to her mother's apartment.

{¶7} On Friday morning, Lowe let Flagg into her apartment to style her hair. Cellular phone records show that Flagg had contacted her drug dealer, Matthew Barwick, several times that morning, and he eventually met her mid-morning "out back" of her mother's apartment and sold her $20 worth of crack cocaine, which he testified was "more than [a] one time use." Shortly after noon, Allen called his mother from "the Hyde Park area" asking for directions to a health-food store. He heard Flagg in the background, and told his mother to make Flagg leave, but she did not. The phone call ended at 12:44 p.m. Allen later clocked into work at 1:56 p.m. in Mason, Ohio.

{¶8} From 1:57 p.m. until 2:26 p.m., Flagg made 16 phone calls to Barwick. Barwick testified that in one of the calls Flagg had told him she had a cellular phone and credit cards to give him in exchange for drugs. Sometime after 2:26 p.m., Barwick met Flagg outside of her mother's apartment. When she entered his car, she offered him a red Verizon phone, later determined to belong to her mother, and credit cards she said she had obtained from the laundry room in her mother's apartment building. Barwick took the phone, refused the credit cards, and gave her drugs. He then drove her to Kandy Loudermilk's house, where he sold Loudermilk

4

$40 worth of drugs. Barwick testified that on the drive to Loudermilk's house he had the car windows down and had not smelled bleach or seen blood on Flagg.

{¶9} An expert in historical cellular phone analysis testified, based on which tower the cellular phones were "pinging," that Flagg's cellular phone had been in the vicinity of the crime scene until 2:12 p.m. on the day Lowe was murdered. His analysis also demonstrated that Barwick had met Flagg that afternoon and had driven her to Loudermilk's house.

{¶10} Loudermilk testified that Flagg had told her that her mother had not paid her the money she had been expecting for styling her hair. Apparently, Lowe had given Flagg the air mattress that Allen used to sleep on, and Flagg still owed her money for it. Flagg arrived at Loudermilk's house with a trash bag that she kept near her.

{¶11} Eventually, Flagg ended up on the doorstep of her boyfriend's home, the night of April 10, 2015. He testified that she looked "rough." He allowed her to stay at his residence for the next few weeks, until she moved into her own apartment.

{¶12} Allen testified that he called his mother's cell phone after his shift was over on April 10, but the call went to voicemail. He was concerned because there was rap music playing on her voicemail and he knew she did not like that type of music. On Saturday night, he called her phone again and heard the same message. At this time, he was commuting to work from Columbus, Ohio, where his girlfriend lived. He contacted the Cincinnati Police in the early morning hours of April 12, 2015, and asked them to check on his mother.

{¶13} Police Officer Roy responded to Lowe's apartment and heard music coming from the apartment. Officer Roy entered the apartment through a window,

because the apartment door was locked. Upon entering the apartment, he smelled a strong odor of bleach and saw Lowe lying between the kitchen and the dining room. There was blood splattered all over the kitchen, and it appeared as if Lowe had been in the process of packing food for work. Lowe's shirt and bra had been pulled up and her pants had been pulled down. Bleach had been doused over the crime scene and on Lowe's body, which left post-mortem burns.

{¶14} Lowe had been stabbed 12 times in the head, neck and torso. Two of the stab wounds had cut through Lowe's ribs and one had pierced her aorta, resulting in her death. Homicide detective Jenny Luke testified that it had appeared that Lowe had put up a fight. In what the coroner described as a defensive wound, one of Lowe's fingers had been nearly cut off. Lowe had also been stabbed three times in the upper back. There were four knives found in Lowe's kitchen—one in a drawer, two in a knife block and one on the counter, which appeared to have blood on it, but it was later determined that it was bits of tomato. A folding knife that contained black and white fibers was later discovered at a residence, which was of significant interest during the investigation. And Flagg's black socks, with what was later determined to be bleach stains, were found in her new apartment.

{¶15} The knives from the kitchen as well as the folding knife were introduced into evidence. The kitchen knives had no blood, fingerprints or DNA on them. The trace-evidence expert testified that the fibers found on the folding knife could have come from the shirt Lowe had been wearing at the time of her murder. A report by the deputy chief coroner, which was admitted into evidence, stated that the folding knife could have caused the wounds on Lowe's upper back, but it could not have caused the fatal stab wounds.

{¶16} There was no cash, credit cards, car keys or apartment key found in Lowe's apartment. The apartment door had been locked. On the bookshelf, by the door, was a paper towel in the shape of a door knob, as if someone had used it when opening the door. Flagg's DNA was found on that paper towel.

{¶17} Allen's DNA was found on the power button to the stereo, and his DNA profile could not be excluded as a contributor to the DNA found on the bottle of bleach under Lowe's kitchen sink. Detective Luke testified that when she had told Allen that his mother had been killed he began to cry. She verified that he had clocked into work at 1:56 p.m. on the day of the murder.

{¶18} Detective Luke interviewed Flagg on April 12, 2015. Flagg told the detective that she had spent Thursday night at her boyfriend's home, and then went to her mother's apartment the next morning to style her mother's hair. She said that during her visit her mother had spoken to Allen on the phone. Flagg said she stayed until 1:00 p.m., and had made plans with her mother to see a movie the next day. Flagg said that she had asked her mother for a ride, but her mother refused because she had to get ready for work. Flagg said she took the bus when she left her mother's house, but had spotted Barwick at a Sunoco station, and had exited from the bus to ask him for a ride to her friend's house. She said that she had spent Friday night with her boyfriend, and had called her mother the next day to go to a movie, but her mother had not picked up the phone. She indicated that her mother's voicemail had rap music on it, which she thought was strange.

{¶19} Detective Luke testified that she had reviewed videos from the Metro bus and had determined that Flagg had never been on it. She had also reviewed the security camera footage from the Sunoco station and had determined that Flagg and

Barwick were never there. Luke further testified that there was no record, from either Flagg's cellular phone or her boyfriend's home and cellular phones, that Flagg had called her mother's phone the day after the murder. Luke testified that the day after she had interviewed Flagg, Flagg had left an angry voicemail telling Luke to stop talking to other people about her mother and that Luke should only speak to her.

{¶20} As part of the investigation, Luke texted Lowe's cellular phone, indicating that she was a homicide detective and that she was looking for the phone. Barwick agreed to leave the cellular phone at a specific location for Luke to retrieve. Barwick ultimately appeared at trial, testifying that on Saturday, April 11, 2015, Flagg had called him and told him to get rid of the red cell phone because her "mother was tracing it." She then called him on Sunday, upset, saying that her mother had been robbed and was taken away in an ambulance.

{¶21} After a second interview with police, where Flagg defensively asked police where they had found her mother's cellular phone, she was arrested for the charged offenses.

## Double Jeopardy

{¶22} In her first assignment of error, Flagg contends that her second jury trial violated the constitutional prohibition against double jeopardy. Initially, we note that Flagg did not object to the second trial or raise the issue of double jeopardy to the trial court. A reviewing court may, but is not required to, consider a constitutional issue raised for the first time on appeal where the rights and interests involved may warrant it. *In re M.D.*, 38 Ohio St.3d 149, 527 N.E.2d 286 (1988); *see State v. Jones*, 12th Dist. Clermont No. CA2001-07-061, 2003-Ohio-815, ¶ 5.

{¶23} Where a defendant in a criminal trial successfully moves for a mistrial, he may invoke the bar of double jeopardy in a second effort to try him only if the conduct giving rise to the successful motion for a mistrial was prosecutorial or judicial conduct intended to provoke the defendant into moving for a mistrial. *Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982).

{¶24} Flagg argues that her second trial should have been barred because the trial court's conduct—announcing to the parties that defense counsel may have opened the door to the admission of a prior conviction—was intentionally calculated to cause a mistrial. But this is not supported in the record. The trial court was unclear as to whether defense counsel's comments in opening argument opened the door to the admission of the prior conviction and asked for research on the issue. After determining that the prior conviction could be admitted, the trial judge stated that he anticipated that the defense would move for a mistrial if he ruled a certain way. He also stated, prior to making his ruling, "I wish I wasn't in this situation frankly." The record does not demonstrate that the court was intentionally trying to cause a mistrial. At most, the record shows that the court recognized a possible future problem. Given the amount of litigation that occurred prior to the first trial over the issue of whether the prior conviction should have been allowed in, and given the fact that a ruling was made in favor of the defense on that issue, the trial court had cause to address defense counsel's comments in opening argument.

{¶25} Because the trial court's actions were not intentionally calculated to cause Flagg to request a mistrial, we overrule the first assignment of error.

**Other Weapons Evidence**

{¶26} In the second assignment of error, Flagg argues that the trial court erred in admitting other weapons evidence in violation of Evid.R. 404(B) and the Due Process Clause of the state and federal constitutions.

{¶27} Because Flagg did not object to the admission of the four kitchen knives found at the crime scene or the admission of the folding knife found at a different residence, we review the admission of the knives for plain error. To constitute plain error, the error must be obvious and outcome determinative; i.e., it must have affected the outcome of the trial. *State v. Lewis*, 1st Dist. Hamilton Nos. C-050989 and C-060010, 2007-Ohio-1485, ¶ 39; *State v. Barnes*, 94 Ohio St.3d 21, 2002-Ohio-678, 759 N.E.2d 1240.

{¶28} Flagg argues that admitting the kitchen knives into evidence, where it was undisputed that none were the murder weapon, was prejudicial error. She cites to *State v. Thomas*, 152 Ohio St.3d 15, 2017-Ohio-8011, 92 N.E.3d 821, in support. In *Thomas*, the defendant was found guilty of stabbing to death a woman outside of the bar where she had been employed and disposing of her body in the woods behind the bar. The Ohio Supreme Court held that the admission of the set of knives that had been found in the defendant's home contravened Evid.R. 404(B) and amounted to plain error where the state knew that the knives had not been used in connection with the murder and where the prosecutor had relied on the knives to "describe Thomas as an owner of 'full Rambo combat knives' with the intent to have the jury infer that Thomas is a dangerous person of violent character." *Id.* at ¶ 45.

{¶29} This case is distinguishable from *Thomas*. First, the four kitchen knives were found at the crime scene, and not in an unrelated location as the knives

had been in *Thomas*. Second, the prosecutor in the instant case told the jury during closing that the knives had been admitted to show the extent of the police investigation, and acknowledged that the knives did not have any blood or DNA on them. Thus, unlike in *Thomas*, the knives had not been introduced to show that Flagg was a violent person. Because the knives were found at the scene and admitted to show the extent of the investigation, we hold that the trial court did not err in admitting the knives into evidence.

{¶30} With respect to the folding knife, we also cannot say that it was error for the trial court to admit it into evidence where that knife contained fibers that the trace-evidence expert testified could have come from the shirt Lowe had been wearing the day she was murdered, and where the coroner's report indicated that the folding knife could have made the three stab wounds on Lowe's upper back that would have had to have gone through her shirt.

{¶31} Based on the foregoing, we overrule Flagg's second assignment of error. We address the remaining assignments of error out of order for purposes of clarity.

**Sufficiency and Weight**

{¶32} In her fifth assignment of error, Flagg contests the sufficiency and weight of the evidence underlying her convictions. When reviewing a challenge to the sufficiency of the evidence, we must determine, after viewing the evidence in a light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the offenses proved beyond a reasonable doubt. *See State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. To reverse a conviction on the manifest weight of the evidence, this court

must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice in finding the defendant guilty. *See State v. Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1997).

{¶33} Under this assignment, Flagg does not contest that an aggravated murder, which requires proof of a specific intent to kill, and an aggravated robbery occurred, and she does not contest that the scene was tampered with or that Lowe's body was desecrated. The only contested issue is whether the state proved she was the perpetrator of those crimes. Viewing the evidence in a light most favorable to the state, we hold there was sufficient evidence to find Flagg guilty of the charged offenses. Flagg concedes that the evidence shows that her mother was killed prior to 3:00 p.m. on Friday, April 10, 2015. By Flagg's own admission, she was at her mother's apartment until shortly after 1:00 p.m. Starting around 1:30 p.m., Flagg called Barwick at least 16 times in a half-hour period. Barwick testified that he met Flagg outside of her mother's apartment between 2:00 p.m. and 2:30 p.m. on April 10, 2015, where she gave him her mother's cellular phone in exchange for drugs. The paper towel most likely used to open the door of the apartment had Flagg's DNA on it.

{¶34} We also hold that the jury did not create a manifest miscarriage of justice by finding Flagg guilty of these crimes. Although Flagg argues that Allen, her half-brother, was most likely the killer, we note that police had verified that he had clocked into work at 1:56 p.m. The jury could have reasonably believed that it was not possible for Allen to have had time kill his mother a little after 1:00 p.m., douse

the apartment with bleach, and then arrive at his job in Mason, Ohio, at 1:56 p.m; especially in light of the fact that the evidence showed that Flagg's cellular phone was still near the crime scene at 2:12 p.m. that day. Flagg also argues that Allen's DNA and not hers was found on the stereo button, but he had lived there up until a month prior to the murder, and it is reasonable that his DNA would still be present in the home. Finally, Flagg argues that Barwick's testimony was unreliable as he was a drug dealer who had pending felony charges against him. But the historical-analysis-of-cellular-phones expert's testimony confirmed Barwick's testimony regarding the location of each person's cellular phones on Friday, April 10th. Further, the jury was in the best position to judge the credibility of witnesses and determine the weight to be given to the evidence. *State v. Blakenburg*, 197 Ohio App.3d 201, 2012-Ohio-1289, 966 N.E.2d 958, ¶ 114 (12th Dist.). Therefore, we will not overturn a conviction on the manifest weight of the evidence unless the evidence weighs heavily against the conviction, which it does not here.

{¶35} The fifth assignment of error is overruled.

## Allied Offenses

{¶36} In her third assignment of error, Flagg contends that the offenses of aggravated murder and aggravated robbery were allied under R.C. 2941.25, and that the trial court erred by not merging the offenses at sentencing. We disagree.

{¶37} This court reviews the trial court's R.C. 2941.25 determination de novo. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 1. Flagg did not object at the sentencing hearing to the imposition of multiple sentences for these offenses. She has therefore forfeited this issue absent a showing of plain

error. *See State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d 923, ¶ 31; Crim.R. 52(B).

{¶38} Under R.C. 2941.25, a trial court must merge offenses if the conduct of the defendant can be construed to constitute two or more allied offenses of similar import, and this conduct shows that the offenses were not committed separately or with a separate animus. *State v. Sanders*, 1st Dist. Hamilton Nos. C-140579 and C-140580, 2015-Ohio-5232, ¶ 46. Thus, separate convictions are permitted for allied offenses if the offenses were (1) dissimilar in import or significance, (2) committed separately, or (3) committed with a separate animus or motivation. *Id.* A reviewing court may end its analysis upon finding that any one of the three applies. *State v. Bailey*, 1st Dist. Hamilton No. C-140129, 2015-Ohio-2997, ¶ 83.

{¶39} In *Sanders*, and *State v. Tibbs*, 1st Dist. Hamilton No. C-100378, 2011-Ohio-6716, this court held that where an offender's conduct demonstrated a purpose, or specific intent, to kill while in the course of committing an aggravated robbery, the two offenses were committed with a separate animus and thus were separately punishable under R.C. 2941.25(B). *Sanders* at ¶ 51; *Tibbs* at ¶ 48. As in *Sanders* and *Tibbs*, the jury here returned a guilty verdict for aggravated murder in violation of R.C. 2903.01(B), after being instructed that "[a]person acts purposely when it is her specific intention to cause a certain result. It must be established in this case that at the time in question there was present in the mind of the defendant a specific intention to cause the death of [Lowe]." Because the jury determined that Flagg had a specific intent to kill Lowe by finding her guilty of aggravated murder, and because we ratified that finding by rejecting Flagg's weight-and-sufficiency-of-the-evidence assignments of error, the aggravated-murder offense was committed with a separate

animus or motivation from the aggravated-robbery offense, and thus the two offenses did not merge under R.C. 2941.25(B). *Id.*; *see State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, paragraph three of the syllabus.

{¶40}  Because the trial court did not err in failing to merge the offenses at sentencing, the third assignment of error is overruled.

## Counsel

{¶41}  In her fourth assignment of error, Flagg contends she was deprived of her right to effective representation of counsel at trial.

{¶42}  Flagg argues that she received ineffective assistance of counsel because her counsel failed to (1) move to dismiss the second trial on double jeopardy grounds, (2) object to the admission of the knives, and (3) raise the issue of allied offenses at sentencing.  But, based on our resolution of those assignments of error dealing with those issues, Flagg cannot demonstrate that trial counsel's performance fell below a reasonable standard of representation or that she was prejudiced.  *See Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  Accordingly, the fourth assignment of error is overruled.

{¶43}  We, therefore, affirm the judgment of the trial court.

Judgment affirmed.

**CUNNINGHAM** and **ZAYAS, JJ.,** concur.


Please note:
>  The court has recorded its own entry on the date of the release of this opinion.

15