[Cite as *State v. Rosemond*, 2022-Ohio-111.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-180221 |
| | | TRIAL NO. B-1507143 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *O P I N I O N.* |
| ANTHONY ROSEMOND, | : | |
| Defendant-Appellant. | : | |


Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Sentences Vacated in Part, and Cause Remanded

Date of Judgment Entry on Appeal: January 19, 2022


*Joseph T. Deters,* Hamilton County Prosecuting Attorney, and *Philip R. Cummings*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Jon R. Sinclair*, for Defendant-Appellant.

**MYERS, Judge.**

{¶1} Defendant-appellant Anthony Rosemond brings a second appeal of the judgment of the Hamilton County Court of Common Pleas convicting him of murder with specifications, three counts of felonious assault with specifications, three counts of having a weapon while under a disability, trafficking in heroin with a specification, and trafficking in cocaine with a specification.

{¶2} Rosemond's convictions stemmed from two separate events, occurring five days apart. His convictions for trafficking and for two of the weapons counts stemmed from the December 3, 2015, traffic stop of a car in which police believed Rosemond had been a passenger. Cincinnati Police Officer Robert Wilson testified that he and his partner were on patrol in the Fay Apartments, a large apartment complex, when a car drove past them in the opposite direction at an extremely high rate of speed. Officer Wilson saw two adults in the front seat of the car.

{¶3} When the officers stopped the car, its only occupants were the driver, Jourdan Bailey, and her young child in the back seat. The child said that his dad had been in the car and that he had run off.[1] In the car, the officers found a baggie of cocaine between the passenger seat and the passenger door. In the back seat, the officers found a large, distinctive Pelle Pelle jacket, with a state-issued identification card belonging to Rosemond inside the jacket. Officers retained the identification card and returned the jacket to the car. Then officers found heroin, cocaine, marijuana, a digital scale, and two handguns in an apartment to which Rosemond had access. Inside the apartment, they also observed clothing for a large adult male.

{¶4} Rosemond's convictions for murder, three counts of felonious assault, and one count of having a weapon while under a disability arose from an event that

---

[1] At first, Officer Wilson thought the child said that "the aunt" had been in the car, so when he asked the child if it was his aunt, the child said, "[N]o, it was my dad." The defendant referred to himself by the nickname "Ant" in recorded jail calls and had "Ant" tattooed on his hand

occurred on December 8, 2015, when gunmen attacked four individuals in a car, killing one of them and injuring the other three. The shooting was captured by various security cameras in the area. Officer Wilson viewed the video recordings and recognized the Pelle Pelle jacket from the earlier traffic stop. The jacket, when retrieved by law enforcement, had gunshot residue on the sleeve. One of the injured victims who testified at trial identified Rosemond as the shooter.

{¶5} Rosemond was indicted for offenses relating to both events in a single indictment. He was convicted of the offenses after a jury trial. The trial court sentenced him to an aggregate total of 57 years to life in prison. At the sentencing hearing, the court did not advise Rosemond about postrelease control, but in its sentencing entry, it imposed periods of postrelease control for each of the offenses, including the murder.

{¶6} This court affirmed Rosemond's convictions on direct appeal, but remanded for proper calculation and award of jail-time credit. *State v. Rosemond*, 2019-Ohio-5356, 150 N.E.3d 563 (1st Dist.), *appeal not accepted*, 159 Ohio St.3d 1435, 2020-Ohio-3634, 148 N.E.3d 592 ("*Rosemond I*"). Rosemond then filed an application to reopen his direct appeal under App.R. 26(B), asserting that he had been denied the effective assistance of appellate counsel.

{¶7} We granted the application to reopen the appeal because it demonstrated a genuine issue as to a colorable claim of ineffective assistance of appellate counsel in failing to assign as error trial counsel's ineffectiveness concerning the imposition of an unauthorized period of postrelease control for murder. *State v. Rosemond*, 1st Dist. Hamilton No. C-180221, 2021-Ohio-768, ¶ 1. Accordingly, we appointed new appellate counsel and ordered that counsel brief the issue of the imposition of postrelease control for murder and any other nonfrivolous assignments of error or arguments not previously considered.

3

{¶8} Rosemond presents two assignments of error for our review. We consider the second assignment of error first.

## I. Ineffective Assistance of Counsel

{¶9} In his second assignment of error, Rosemond claims that he was denied the effective assistance of counsel at both the trial-court and appellate levels when counsel failed to argue that the gun and drug charges should not have been joined with the murder and assault charges in the same indictment under Crim.R. 8. In *Rosemond I*, we found no prejudice to Rosemond in the trial court's failure to sever these charges under Crim.R. 14. Rosemond now argues that his counsel at trial and on appeal should have argued misjoinder under Crim.R. 8, not severance under Crim.R. 14.

{¶10} Trial counsel will not be considered ineffective unless counsel's performance was deficient and caused actual prejudice to the defendant. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 141-142, 538 N.E.2d 373 (1989). Trial counsel's performance will only be deemed deficient if it fell below an objective standard of reasonableness. *Strickland* at 688; *Bradley* at 142. A defendant is only prejudiced by trial counsel's performance if there is a reasonable probability that the outcome of the proceedings would have been different but for the deficient performance. *Strickland* at 694; *Bradley* at 142.

{¶11} The Supreme Court of Ohio has stated, "Under *Strickland*, a reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceedings." *State v. Simpson*, 164 Ohio St.3d 102, 2020-Ohio-6719, 172 N.E.3d 97, ¶ 14, citing *Strickland* at 694. An appellant's failure to satisfy either prong of the *Strickland* test is fatal to an ineffective-assistance-of-counsel claim. *State v. Bandy*, 1st Dist. Hamilton No. C-160402, 2017-Ohio-5593, ¶ 73; *Strickland* at 697.

{¶12} In a reopened appeal, we review the performance of appellate counsel under the same standard: an appellant must show that appellate counsel's performance was objectively unreasonable and that there is a reasonable probability that the result of the appeal would have been different but for counsel's errors. *See Simpson* at ¶ 14, citing *Strickland* at 688; App.R. 26(B)(9) (the inquiry is whether "the performance of appellate counsel was deficient and the applicant was prejudiced by that deficiency.").

{¶13} For purposes of this reopened appeal, we assume that the charges were misjoined under Crim.R. 8. We further assume that trial counsel was deficient for not arguing this to the trial court. We further assume that appellate counsel was deficient for not raising it on appeal.

{¶14} Assuming without deciding that trial and appellate counsel's performance was deficient for failing to raise misjoinder under Crim.R. 8, we focus our analysis on the second prong under *Strickland* as it is determinative in this case. As to trial counsel's failure to raise misjoinder, was there a reasonable probability that the result of the trial would have been different if the gun and drug charges were not joined with the murder and assault charges? And, as to appellate counsel's failure to raise misjoinder on appeal, was there a reasonable probability that the result of the appeal would have been different? We answer both of these questions "no."

## A. The Trial

{¶15} The limited issue before us is whether there is a reasonable probability that: (1) the jury would not have found Rosemond guilty of murder and assault had the gun and drug charges not been joined; or (2) the jury would not have found Rosemond guilty of the gun and drug charges had the murder and assault charges not been joined. We do not think there is a reasonable probability of either outcome. Stated another way, there is not a probability sufficient to undermine confidence in

5

the outcome of the trial or appeal. The evidence was overwhelming as to each set of charges.

### 1. Murder and Assault

**{¶16}** The evidence considered by the jury as to the murder and assault charges consisted of, among other things: (1) eyewitness testimony; (2) admissions by Rosemond in jail calls; (3) video recordings of the shootings, as well as Rosemond's actions immediately before and immediately after; and (4) forensic evidence. Taken together, we cannot say that there is a reasonable probability that the result of the trial would have been different had the other charges not been tried at the same time.

### a. Eyewitness Testimony

**{¶17}** Ariontez Nared identified Rosemond as the person who shot him. He was clearly a reluctant witness, so much so that the trial court called him as its own witness. In fact, Nared initially told the prosecutor that he was not shot at all, but rather was hit by a bus.

[PROSECUTOR]: And you and I have met before; correct?

[NARED]: Yep.

[PROSECUTOR]: And you indicated to me that you didn't want to participate or testify; right?

[NARED]: Yep.

[PROSECUTOR]: On a prior occasion in court, you even indicated that you were - - or strike that.

On one occasion you said you didn't want to testify, and I said that you had been shot, and that's why I brought you here. Do you remember that?

[NARED]: Um-hmm.

\* \* \*

[PROSECUTOR]: And you told me you weren't shot; you were hit by a bus; right?

[NARED]: Yep.

[PROSECUTOR]: And you weren't hit by a bus; right?

[NARED]: No, sir.

[PROSECUTOR]: You just didn't want to testify; right?

[NARED]: I got frustrated. I was tired of being here.

{¶18} At trial, Nared testified as follows:

[PROSECUTOR]: Kind of describe for us how the shooting happened.

[NARED]: I can't really tell you, for real. I came out the store, I proceeded to make a left, and I started walking a little bit. Then I heard the shots. As I heard them, I looked back.

Over my shoulder I seen a flash from the gun, and I seen his bitch-ass, and I started walking, and basically - - not walking, but I started running after I seen the flash - -

[PROSECUTOR]: Let me stop you for a moment. When you say you "seen his bitch-ass," who you talking about?

[NARED]: Him, right here.

[PROSECUTOR]: Which person?

[NARED]: Ant.

[PROSECUTOR]: Describe him for us.

[NARED]: Him. You-all know who the - - you-all know who he is. Him, right here.

[PROSECUTOR]: I know this sounds ridiculous, but you have to - - you have to identify him.

THE COURT: Is he - - what is he wearing?

[NARED]: White shirt and blue pants.

7

[PROSECUTOR]:  This man right here?

[NARED]:  The reason we're here.

What?

[PROSECUTOR]:  This guy right here?

[NARED]:  Yeah.

THE COURT:  He's picked the defendant.

[PROSECUTOR]:  Thank you, Your Honor.

[PROSECUTOR]:  Did you see him before you were in the store?

[NARED]:  Yeah; it was mass people out there.  I ain't going to necessarily say I seen his face, but it was hella people out there.

[PROSECUTOR]:  When the shooting started, you saw him?

[NARED]:  Yep.

[PROSECUTOR]:  Where was he?

[NARED]: Standing right there by the wall.

[PROSECUTOR]:  And what - - how many - - could you tell how many people were firing at you?

[NARED]:  No; I just seen that flash.  When I turn around, I see him. Try to run, and I fell.

[PROSECUTOR]:  Okay.  How many times did you get shot, if you know?

[NARED]:  I got shot seven times by four different calibers.

**{¶19}**  In addition, Nared specifically identified Rosemond as the shooter in his answers on cross-examination:

[DEFENSE COUNSEL]:  So you did not see his face?

[NARED]:  I told you I seen his face.  You heard me say that.

[DEFENSE COUNSEL]:  I'm sorry?

8

[NARED]: I said I seen his face. I turn around, the flash from the gun and his face. That's what made me see the face; the flash from the gun.

* * *

[DEFENSE COUNSEL]: Okay. Did you see anybody with a gun that was shooting?

[NARED]: Yep.

[DEFENSE COUNSEL]; And how many people with guns were shooting?

[NARED]: The person I seen, one.

**{¶20}** Even defense counsel conceded that Nared "pointed the finger" at his client. He only argued that Nared's testimony was not believable.

### b. Jail Calls

**{¶21}** At trial, several recorded jail calls were introduced into evidence. These calls show that Rosemond was concerned that law enforcement had him on videotape. He was particularly concerned that they had him on videotape running to the car after the shootings, and on camera at the scene, wearing the Pelle Pelle jacket. But, most telling is his admission when talking to a friend about the shooting:

[ROSEMOND]: But, you know, I got the - - the shit - - the ba-ba shit beat, though, you feel me? They - - all the witnesses said it wasn't me. You feel me?

MAN: Right.

[ROSEMOND]: And then dude - - then dude mama showed up and was clowning on the detectives, and shit, like, You-all got the wrong person. Let that boy go. You-all fucking up that boy's life. You feel me?

MAN: Right.

9

[ROSEMOND]: So they - - then the one n***** who - - **he got hit on my shit, he told him, like, he ain't get shot; he got hit by a bus**, and all this shit. You hear me? Like, so, like - -

(Emphasis added.)

{¶22} In that call, Rosemond admits shooting Nared, when he says: "So they - - then the one [individual] who - - he got hit on my shit, he told him, like, he ain't get shot; he got hit by a bus, and all this shit." Detective Greg Gehring testified that he was familiar with this slang and that it meant, "He got hit on what I did, on my shootings." The only reasonable interpretation of this statement is that Rosemond is telling his friend that the guy who got "hit" (shot) on his "shit" (gun or bullet) is now saying he got hit by a bus. And this admission comes right after Rosemond has said that all the witnesses said it was not him, so he is clearly talking about the murder and assault charges, not the drug charges.

{¶23} In the very next call, Rosemond tells a woman that everyone showed up and said it was not him. He is laughing about it. The woman says, "But it was you." And Rosemond does not deny it.

{¶24} And, in the final call, after Rosemond laughingly claims over and over that they have nothing on him, the mother of his child reminds Rosemond that she knows what happened because he came to her house. Rosemond repeatedly states that they have nothing on him, but she says that she does. Rosemond begins calling her a "rat," and makes threatening comments.

{¶25} Taken individually and as a whole, these calls constitute admissions by Rosemond and are evidence of his guilt. And additional charges of guns and drugs do not change this evidence that the jury considered.

### c. Videotape

{¶26} In addition to Rosemond's own statements and the eyewitness testimony identifying Rosemond as one of the shooters, the jury also had videotape

10

evidence from the shooting that it considered. Among other things, the video shows Rosemond following Nared out of the store, approaching the car Nared and the other victims were in, walking toward the gunfire and not away from it, making movements as if he were shooting, staying in the area of the gunfire until the shooting was over, and jumping into a getaway car that had been idling and waiting for him.

{¶27} As we found in *Rosemond I*:

And the video recording that captured the incident clearly shows Rosemond approach the vehicle and dance around it for several seconds as if firing a weapon. The video also seems to show flashes around where only Rosemond was standing, indicating that he was shooting. It was not until the shooting had ended that Rosemond was seen fleeing from the scene. It strains credibility that someone would be so close to the scene in which multiple shooters were attacking the four men and remain there while the shooting occurred, only to run when it was over. And while all the other cars in the area left, the Tahoe that Rosemond would eventually get into remained until after the shooting had ended and he had returned.

*Rosemond I* at ¶ 82.

{¶28} As the surveillance video recordings were played for the jury, Detective Gehring described the events depicted in them. Shortly before the shooting occurred, he noted that Rosemond's getaway vehicle was in the market parking lot, its driver "staging up" and "[g]etting ready to pick these guys [up] and get out of there." When Nared exited from the Schwarz Market to walk down the sidewalk to the car where his three companions waited, the detective described Rosemond as "following or stalking" Nared down the sidewalk. The detective testified that Rosemond could be seen pointing as he approached the victims' vehicle. He

acknowledged that a gun could not be seen in Rosemond's hand, but stated, "I think that motion, the action is consistent with someone pointing a gun." He testified that Rosemond "put his arm up pointing to where the gunshots are being received," noting that Rosemond was "advancing towards that area with his hand outstretched, clearly[,] towards the time of the shooting." He said that the video depicted Rosemond as he continued to advance toward the victims' car just before four muzzle flashes could be seen.

{¶29} We also note that Rosemond himself was concerned with the inculpatory nature of his actions captured on the videos. In his recorded jail calls, Rosemond was worried that the videos showed him wearing the Pelle Pelle jacket and showed him running to the car only after the shooting ended. He was concerned that DNA tied him to the getaway car. When Rosemond initially spoke with police, he said he had not heard about the shootings and denied it was him in the still photos taken from the videos. The videos tell a different story.

{¶30} The dissent in *Rosemond I* disagreed with the majority as to what the video showed, and does so again. But the jury reviewed this same evidence and, in conjunction with the other evidence, found Rosemond guilty of murder and assault. It reviewed the video, considered the officer's testimony of what it showed, considered all of the evidence relied upon by the dissent, and reached its own conclusion. The issue in this appeal is whether there is a reasonable probability that the jury would have come to a different conclusion on the murder and assault charges had the gun and drug charges not been joined for trial.

### d. Forensic

{¶31} In addition to the eyewitness identification, Rosemond's statements, and the video, the jury also considered forensic evidence. Among other things, Rosemond's jacket was tested and found to have gunshot residue ("GSR") on it. The dissent argues that the GSR could have been deposited on the jacket from someone

else's shooting. While this is true, it is equally true that it may have been deposited on his jacket because he shot a gun, just like the eyewitness testified. The jury certainly could have considered the GSR along with all the other evidence in finding Rosemond guilty of murder and assault. Again, the issue before us is whether there is a reasonable probability that the result of the trial would have been different if the murder and assault charges were not joined with the gun and drug charges.

### 2. Drugs and Guns

{¶32} The evidence considered by the jury as to the drug and gun charges consisted of: (1) evidence found in Bailey's apartment and vehicle; and (2) admissions by Rosemond in jail calls. Taken together, we cannot say that there is a reasonable probability that the result of the trial would have been different had the murder and assault charges not been tried at the same time.

### a. Evidence from Bailey's apartment and vehicle

{¶33} As we stated in *Rosemond I*:

When [Bailey's car] was first seen, there were two adults in the front. When police eventually stopped the car, there was only the driver. Rosemond insinuates that the police somehow coerced Bailey's son into saying that he was the one who jumped out of the vehicle. But, at the time the child made that statement, the record seems to indicate that the officers had no idea who the other person was. The statement was made before Rosemond's identification card was found in the Pelle Pelle jacket. The drugs found in the car were found on the passenger's side of the car, where Rosemond had been sitting.

Additionally, other evidence provided circumstantial links between Rosemond and the apartment and its contents. There were a number of clothing items that would have fit someone of Rosemond's larger size.

13

*Rosemond I* at ¶ 76-77.

### b. Admissions by Rosemond

{**¶34**}  As we said in *Rosemond I*:

But, more significant than that, the series of recorded jail calls between Rosemond and Bailey made it relatively clear that, while there was no actual DNA evidence found on any of the contraband, Rosemond believed that it would be.  The calls from Rosemond to Bailey began the day he was arrested and brought to the Hamilton County Justice Center.  He asked her to get rid of various items, providing evidence that they were working together in a criminal enterprise.  He said that "they made me take DNA for them gun."  He then referred to the two guns in the apartment.  In another call, he essentially admitted the drugs [were] his when he told Bailey "he didn't even charge me with the dope, though.  You hear me?  He doesn't understand.  Why they asking me about the guns but not my drugs that were in that house too?"  In another call, Rosemond is talking to another person about Bailey, and he says, "But I'm gonna tell her, like, man, my DNA all over that shit; the drugs and the guns."  In another call, he says, "No, I am talking about the drugs.  They got my DNA on the drugs."

Rosemond believed that his DNA would be or had been found on the contraband seized from the apartment.  And his flight from the vehicle when police attempted to stop [it] was further evidence of his consciousness of guilt.

*Rosemond I* at ¶ 77-78.

{**¶35**}  With respect to the murder and assault charges, the jury considered Nared's identification of Rosemond as the shooter, Rosemond's statements in the jail

call about the shooting, the videotape evidence, and the forensic evidence, including the GSR on his jacket. With respect to the gun and drug charges, the jury considered the testimony of the police officers as to the drugs found in Bailey's car and as to the guns and drugs found in her apartment, in addition to Rosemond's numerous statements about the guns and drugs in the jail calls. Given the overwhelming evidence of Rosemond's guilt as to each set of charges, we do not find a "probability sufficient to undermine confidence in the outcome of the proceedings." *See Simpson*, 164 Ohio St.3d 102, 2020-Ohio-6719, 172 N.E.3d 97, at ¶ 14. Therefore, we hold that Rosemond has failed to demonstrate that he suffered prejudice as a result of trial counsel's failure to argue that the murder and assault charges should not have been joined with the gun and drug charges under Crim.R. 8.

### B. The Appeal

**{¶36}** Because Rosemond has failed to demonstrate that he suffered prejudice as a result of trial counsel's failure to raise the issue of misjoinder under Crim.R. 8, he cannot demonstrate that he was prejudiced by appellate counsel's failure to assign as error trial counsel's deficiency. We hold that there is no reasonable probability that the result of the appeal would have been different but for appellate counsel's deficiency. We overrule the second assignment of error.

### II. Postrelease Control

**{¶37}** In his first assignment of error, Rosemond argues that the trial court erred by imposing postrelease control as part of his sentence for murder and by "fail[ing] to state terms of post-release control during sentencing for other convictions." The state concedes the error.

**{¶38}** Murder is a special or unclassified felony to which the postrelease-control statute does not apply. *See State v. Clark*, 119 Ohio St.3d 239, 2008-Ohio-3748, 893 N.E.2d 462, ¶ 36; R.C. 2967.28(B). Rather, an offender convicted of murder may become eligible for parole after the expiration of the minimum prison

term. R.C. 2967.13(A)(1). Therefore, the trial court erred in imposing postrelease control as part of Rosemond's sentence for murder. *See Rosemond*, 1st Dist. Hamilton No. C-180221, 2021-Ohio-768, at ¶ 8. In addition, at the sentencing hearing, the trial court failed to notify Rosemond about postrelease control when it sentenced him on the remaining felony offenses. *See* R.C. 2929.19(B).

{¶39} Prior appellate counsel's failure to challenge the imposition of postrelease control prejudiced Rosemond. Therefore, we sustain the first assignment of error.

### III. Conclusion

{¶40} We hold that Rosemond was not sentenced in conformity with the statutes governing postrelease control, and that prior appellate counsel's performance in that regard was prejudicially deficient. *See* App.R. 26(B)(7). Accordingly, upon the authority conferred by App.R. 26(B)(9), we vacate that part of our December 27, 2019 judgment affirming his sentences. And we vacate, and remand for correction of, the postrelease control portions of those sentences, in accordance with law and this opinion. In all other respects, the judgment of conviction is affirmed.

Judgment accordingly.


**BOCK, J.,** concurs.
**ZAYAS, P.J.,** dissents.

**ZAYAS, P.J.,** dissenting.

{¶41} I agree that the trial court erred in imposing postrelease control as part of Rosemond's sentence. However, I respectfully disagree with the majority's resolution of Rosemond's second assignment of error. Rosemond's trial counsel was deficient for failing to file a motion to sever under Crim.R. 8 because the motion had a reasonable probability of success. Appellate counsel was also deficient in failing to

raise the issue on appeal. The misjoinder resulted in substantial prejudice to Rosemond.

## I. Misjoinder

{¶42} " 'When a claim of ineffective assistance of counsel is based on counsel's failure to file a particular motion, a defendant must show that the motion had a reasonable probability of success.' " *State v. Jones*, 10th Dist. Franklin No. 11AP–1123, 2012-Ohio-3767, ¶ 31, quoting *State v. Carmon*, 10th Dist. Franklin No. 11AP–818, 2012-Ohio-1615, ¶ 12. To determine whether trial counsel's performance was deficient, we must first determine whether the motion would have been successful. *See id.*

{¶43} Joinder under Crim.R. 8 "involves a question of law we review de novo." *State v. Kennedy*, 2013-Ohio-4221, 998 N.E.2d 1189, ¶ 24 (1st Dist.). Crim.R. 8(A) provides that "two or more offenses may be charged in the same indictment" if the offenses are (1) "of the same or similar character"; (2) "based on the same act or transaction"; (3) "based on two or more acts or transactions connected together or constituting parts of a common scheme or plan"; or (4) "part of a course of criminal conduct." Crim.R. 8(A). "Ohio law clearly favors joining multiple offenses in a single trial if the requirements for joinder under Crim.R. 8(A) are met." *State v. Lee*, 8th Dist. Cuyahoga No. 109215, 2021-Ohio-2925, ¶ 12. However, if the charged offenses do not meet at least one of the four joinder requirements, the charges should be severed, "even in the absence of prejudice." *Kennedy* at ¶ 24.

{¶44} Here, the state argues that joinder was proper under Crim.R. 8(A) as offenses "connected together" due to the connection of "evidence, witnesses, and overlapping investigations." Essentially, the state argues that the charges were connected together because the witnesses and evidence in both sets of charges

overlapped. The state cites to no case law interpreting Crim.R. 8. to support that proposition, and I could find none.

{¶45} Courts have found offenses sufficiently connected together when the evidence shows the offenses are related to each other. *See United States v. Cole*, 857 F.2d 971, 973 (4th Cir.1988) (Finding offenses "connected together" where the evidence established that the "various drug charges stemming from a large-scale cocaine distribution ring with the defendant's alien smuggling charges where the aliens smuggled into the country began to sell cocaine for his distribution ring after their arrival.").

{¶46} Courts have found that offenses are not "connected together" when the offenses are not logically related. *See United States v. Terry*, 911 F.2d 272, 274 (9th Cir.1990) (finding "improper joinder of charges of narcotics possession and being a felon in possession of a firearm, where narcotics were found in the defendant's vehicle forty miles away from his home and a search of the defendant's home thirteen days later uncovered a shotgun but no evidence of drug activity."); *United States v. Cardwell*, 433 F.3d 378, 387 (4th Cir.2005) (requiring "additional facts" beyond the discovery of a gun during the investigation of a murder-for-hire plot as a basis for joinder of the possession of a gun charge with the murder-for-hire charge); *United States v. Hawkins*, 776 F.3d 200, 209 (4th Cir.2015) (explaining that "a mere temporal relationship is not sufficient to establish the propriety of joinder.").

{¶47} The state relies on *State v. Jeffries* to support its claim that offenses are properly joined when they were investigated at the same time and have overlapping witnesses. *See State v. Jeffries*, 2018-Ohio-2160, 112 N.E.3d 417, ¶ 55. In *Jeffries*, this court found that the sex offense charges and drug charges were properly joined under Crim.R. 8(A) because "the offenses were part of a course of

18

criminal conduct." *Id.* at 56. Here, the state does not argue the charges were part of a course of criminal conduct, and a review of the indictment and the evidence presented at trial substantiates the lack of a nexus or link between the two sets of charges.

{¶48} With respect to the overlapping investigations, the Ohio Supreme Court expressly rejected that argument in *State v. Atkinson*, 4 Ohio St.2d 19, 211 N.E.2d 665, (1965). In *Atkinson*, the state argued that joinder was proper because the charges "*arose out of the investigation of counts one and two.*" (Emphasis in original.) *Id.* at 20. The court concluded that:

> This proposal or argument of the prosecuting attorney would create a new category or classification of offenses that may be joined in an indictment under the heading of 'Offenses Connected in their Discovery.' The statute does not make any such provision nor does the record itself show any connection between counts one and two and the third count in the acts or conduct of the defendant.

*Id.* at 21.

{¶49} The state further argues that the same witnesses and evidence were necessary for each group of charges because the officer involved in the drug and gun arrests found Rosemond's jacket and provided Rosemond's name to the officers investigating the shooting, and Rosemond was wearing the jacket at the time of the shooting. But, Crim.R. 8(A) provides no category of joinder on that basis.

{¶50} Moreover, Rosemond's identity was not at issue in the shooting offenses. In the opening remarks, the defense admitted that Rosemond was present at the time of the shooting, but was not one of the shooters. Thus, the officer's testimony about finding the coat and Rosemond's ID in the car, was not relevant to

the shooting offenses. Finally, as we acknowledged in *Rosemond I*, "the evidence related to the counts arising from the December 3 traffic stop was distinct from the evidence related to the December 8 shooting." *Rosemond I* at ¶ 16.

{**¶51**} Therefore, I would hold that the two sets of offenses were not connected together as contemplated by Crim.R. 8(A) and joinder was improper. Had trial counsel filed a motion challenging the misjoinder, the motion had a reasonable probability of success. Accordingly, I conclude that trial counsel's performance fell below an objective standard of reasonable representation.

## II. The Misjoinder was Prejudicial

{**¶52**} To show prejudice, Rosemond must establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674. Prejudice from defective representation justifies reversal only where the results were unreliable or the proceeding was fundamentally unfair as a result of the performance of trial counsel. *State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995), citing *Lockhart v. Fretwell*, 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

{**¶53**} "The prejudice inquiry, thus, focuses not only on outcome determination, but also on 'whether the result of the proceeding was fundamentally unfair or unreliable.' " *State v. Smith*, 2016-Ohio-7566, 76 N.E.3d 551, ¶ 69 (5th Dist.), quoting *Lockhart* at 369. *See United States v. Cronic,* 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) ("[T]he right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial"). "Thus, an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." *Lockhart* at 369.

{¶54} The majority's analysis focuses solely on outcome determination without any discussion of the unreliability and fundamental unfairness of the trial. Moreover, the majority's conclusion that "the evidence was overwhelming as to each set of charges" is inconsistent with the *Rosemond I* conclusion that the convictions on the drug and weapon counts were based upon "circumstantial evidence." *Rosemond I* at ¶ 79. With respect to the drug and gun charges, the *Rosemond I* majority acknowledged that the "evidence provided circumstantial links between Rosemond and the apartment and its contents" and the convictions were based on "circumstantial evidence [linking] Rosemond to the drugs and weapons seized on December 3, 2015." *Rosemond I* at ¶ 77, 79. Bailey, who possessed the key to the apartment, lived in the apartment and "faced the same charges related to the drugs and guns. *Id.* at ¶ 6, 8, 112. "She resolved the charges by pleading guilty upon reaching an agreement with the state." *Id.* at ¶ 112.

{¶55} Additionally:

> Rosemond did not live at the Nottingham apartment where the drugs and gun were located. His identification card listed his address as Hewett Avenue, and the docketing statement in this case reflects his Hewett address. The search did not yield any mail or personal papers belonging to Rosemond. Other than a pair of pants that "could" be large enough to fit Rosemond, there is no evidence that Rosemond lived there or was an overnight guest prior to the search.

*Id.* at ¶ 95 (Zayas, J., concurring in part and dissenting in part).

{¶56} Similarly, after viewing the evidence in the light most favorable to the state, the majority in *Rosemond I* relied on circumstantial evidence to conclude the

21

evidence was sufficient to support the convictions on the murder and assault charges. *Id.* at ¶ 81-83. The alleged motive for the murders was that Austin, one of the victims, "was executed for having testified in another murder trial." *Id.* at ¶ 73. "Austin had been trying to keep a low profile because he had testified in the trial of a man who had killed Austin's cousin." *Id.* at ¶ 9. Yet the state presented no evidence tying Rosemond to Austin, the person accused of murdering Austin's cousin, or Austin's cousin. The state did not recover a murder weapon, and the video does not depict Rosemond holding or firing a gun. The video confirms what Rosemond admitted at trial: he was present during the shooting.

{¶57} The video also depicts two individuals who appear to be shooting toward the victims, one on the sidewalk to the left of Rosemond, and one inches away from him on the right. As the trace examiner explained, the GSR found on Rosemond's coat was the result of the jacket "having been in the vicinity" of a discharged firearm. The trace examiner also testified that she did not know whether the GSR was on the sleeve of the jacket or the body of the jacket. Thus, I note that the majority's assertion that the GSR was on the sleeve of the jacket is contrary to the trace examiner's testimony. Accordingly, the GSR evidence, at most, establishes what Rosemond admitted at trial: he was present during the shooting.

{¶58} The shooting ended 15 seconds after it started, and at that time, Rosemond ran to the parking lot. The video shows that the driver of the Tahoe attempted to leave multiple times but was blocked in its parking spot by other cars that were leaving. When Rosemond arrived at the parking lot, the driver, who finally had a clear path, was leaving when Rosemond arrived. Thus, it cannot be said that the video evidence conclusively established that the Tahoe deliberately remained at

the scene to serve as the "getaway car." Unlike the majority, I rely on the events as depicted in the video rather than the detective's interpretation of the video.

{¶59} Additionally, as I previously articulated,

One of the victims testified that Rosemond did not shoot him, and that he was shot by a skinny man in red. Notably, the video shows a skinny man in red in the street, to the right of Rosemond, who appears to be dancing as if he were shooting,[2] and moving towards the victim's car. A second victim did not see any of the shooters.

A third victim, Nared was shot seven times by four different calibers of guns. Initially, he did not implicate Rosemond in the shooting. However, at trial, he testified for the first time that he saw Rosemond standing by the wall after the shooting started. But, the video shows that it was not Rosemond standing by the wall when the shooting started. Instead, it was a man in white tennis shoes standing on the sidewalk by the wall, moving his feet as if he were firing a gun, who then ran down the sidewalk toward Nared.

Although Rosemond was visible in the video, he was never seen with a gun. When the shooting started, he ducked next to the driver's side of the white car and was no longer visible. Simultaneously, the skinny man entered the video and appeared to be shooting for the next six seconds. Once the skinny man ran away from the scene, Rosemond again appeared, plodding up the sidewalk next to the white car. Rosemond is a very large man who is 6 feet 2 inches tall and weighs 300 pounds. He does not appear to move very quickly, and it took him

---

[2] Gehring testified that when the feet are moving as if dancing, the person may be firing a weapon.

a full second to run the length of the white car. Notably, he was not carrying a gun, and his hands were in his pockets.

Two seconds after Rosemond ducked behind the white car, four flashes can be seen, but those appear to be coming from the right of the victim's car, which was approximately 54 feet away from where Rosemond ducked behind the car. Three seconds after the flashes stop, Rosemond plodded by the white car. It appears that he had been hiding between the white car and the Honda, because he did not run in front of the headlight of the victim's car.

During the shooting, several people called 911 and provided descriptions of the shooters. One of the callers described the suspect as a black male, wearing a brown jacket with fur that left the scene in a white Bronco. Another witness, Teresa, described one shooter as a black male, 30-40, whose nickname was possibly Capone, wearing a brown, puffy coat with a fur collar and standing next to a white SUV. She also described a second shooter as an 18-19 year old male black wearing a red shirt or sweatshirt and dark pants, who fled on foot. According to one witness, the shooters were wearing masks. Another witness stated that three suspects fled on foot. One witness provided the nicknames of four suspects. Yet none of the witnesses who called described Rosemond as one of the shooters.

Finally, I am not convinced that Rosemond's statement that Nared was "hit [on] my shit" was correctly interpreted by the majority. The majority characterized this statement as a joking admission to shooting Nared. However, in a different call where he is discussing the accusations made by the police, he stated, "They hit me with some fake

shit." Based on the context of this statement, I cannot conclude that "hit me" refers to shooting.

*Rosemond I* at ¶ 113-118.

{¶60} I am equally unpersuaded by the majority's interpretation of two other jail calls as "admissions." The majority claims that Rosemond did not deny an accusation that he was the shooter. Having listened to the call, Rosemond was speaking when the comment was made. Rosemond continued to speak as if he did not hear the comment when the call was abruptly disconnected. The final call was a contentious call with a woman named Brie. During that call, Brie threatened to harm Rosemond's mother, then he threatened to harm her. When she realized the call was being recorded, she claimed that she knew what happened and would testify against him. Rosemond repeatedly stated that there was nothing for her to testify about. Then he offered to give her telephone number to the prosecutor, and she told him not to. Rosemond called her a "rat" after she discussed working with the DEA and building a case against him as a detective. The two bickered throughout the call, and when Rosemond asked to speak with his daughter, she claimed he was not the father. Given the context of the calls, I do not interpret them as admissions of guilt, and I disagree with the majority's conclusion that "the evidence was overwhelming as to each set of charges."

{¶61} But, our task is not to determine whether the evidence was sufficient. The issue here is whether Rosemond was prejudiced by the misjoinder. Because the evidence here is circumstantial and subject to multiple interpretations, the misjoinder resulted in the improper admission of prejudicial evidence that rendered the trial "unreliable" and "fundamentally unfair." *See State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995), citing *Lockhart*, 506 U.S. at 369, 113 S.Ct. 838, 122 L.Ed.2d 180.

{¶62} The admission of drugs and a gun unrelated to the shooting was irrelevant and highly prejudicial and "leads only to inferences about matters that were not properly provable in this case, i.e., the defendant's dangerous character." *State v. Thomas*, 152 Ohio St.3d 15, 2017-Ohio-8011, 92 N.E.3d 821, ¶ 41, quoting *Walker v. United States*, 490 F.2d 683, 684-685 (8th Cir.1974). The evidence of an unrelated gun "could only have inflamed the passions of the jury. This evidence added absolutely nothing to the [murder] case against the defendant except to suggest to the jury that he was a bad man." *Id.* at ¶ 43, quoting *People v. Drake*, 142 Mich.App. 357, 360, 370 N.W.2d 355 (1985). The admission of the gun was "presumptively harmful error because of the danger the jury will consider the accused's bad character or propensity to crime as evidence of guilt." *Id.* at ¶ 42, quoting *Agatheas v. State*, 77 So.3d 1232 (Fla.2011).

{¶63} Likewise, the evidence related to the murder and felonious-assault charges was unrelated to the drug and gun charges and would have been inadmissible if the offenses had not been improperly joined. The admission of the other acts evidence "suggested that Rosemond has a general propensity to commit serious and violent crimes which can have a 'substantial and injurious effect or influence in determining the jury's verdict.' " *Rosemond I* at ¶ 120, citing *United States v. Lane*, 474 U.S. 438, 449, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986), quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

{¶64} As I previously explained,

The bad conduct offered in evidence to prove the unrelated offenses certainly had a substantial effect on the jury's verdict. *See, e.g., United States v. Holloway*, 1 F.3d 307, 312, (5th Cir.1993) (concluding that by failing to sever the weapons charge from the unrelated robbery charges, "the jury emphatically was told that [the defendant] was a bad and dangerous person 'by his very nature,' and

that a felon who carried a gun was just the sort of character who was most likely to have committed the robberies charged in the indictment."). Here, as in *Holloway*, Rosemond "was unjustifiably tried, at least in part, on the basis of who he was, and not on the basis of the material evidence presented against him." *See id.*

The evidence submitted to support the unrelated charges portrayed Rosemond as a violent and dangerous person as evidenced by the prosecutor's remarks that Rosemond "shot up people" and "executed" and "gunned down" the victim in the shooting, and that he was a guy who bought, sold, and used drugs and carried guns. The jury was told that Rosemond was a violent, drug trafficker who possessed guns and was likely to commit all of the charged offenses. *See id.*

And the record reflects that the jurors became fearful about their names being publicly released during the course of the trial. During an unrecorded break, the trial court, prosecutor, and defense counsel had a conversation regarding the jurors' concerns regarding the murder case. By agreement, the trial court spoke with the jurors and attempted to allay those concerns. On that same day, the court ordered that all records with personally identifying information about the jurors, including the entirety of the voir dire, be sealed from the public view. The bad-conduct evidence regarding the unrelated charges had a strong impact on the jurors' emotions.

*Rosemond I* at ¶ 120-122.

{¶65} I conclude that the misjoinder resulted in a trial that was unreliable and fundamentally unfair because of the deficient performance of trial counsel. *See*

*Smith*, 2016-Ohio-7566, 76 N.E.3d 551, at ¶ 69.    I would reverse Rosemond's convictions and remand the cause for two new trials.    Ultimately, "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly."    *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Please note:

The court has recorded its own entry this date.